**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DENNIS M. KUZARA,<br><br>Plaintiff,<br><br>v.<br><br>DETECTIVE STEVE DREWS,<br>SERGEANT ABDIEL ACEVEDO,<br>DETECTIVE CHRISTIAN BOGNETTI,<br>SERGEANT JORGE GONZALEZ,<br>DETECTIVE JOHN SPENCER,<br>DETECTIVE MICHAEL SALVAGGIO,<br>COMMANDER ROBERT BRANDT,<br>DETECTIVE JOSEPH GUTIERREZ,<br>DETECTIVE VICTOR LEZOTE,<br>CHIEF TODD SHAVER,<br>DETECTIVE JAMES MARSOLLAIS,<br>DETECTIVE JOHN STEINHABLE,<br>and THE VILLAGE OF<br>CARPENTERSVILLE,<br><br>Defendants. | Case No: ____________<br><br>Jury Trial Demanded |

# COMPLAINT

NOW COMES Plaintiff, DENNIS M. KUZARA, by and through his attorneys, The Law Offices of Kathleen T. Zellner, P.C. and for his complaint against Defendants, states as follows:

## Introduction

1. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of plaintiff's rights as secured by the United States Constitution.

2. Specifically, as a result of the egregious misconduct and abuse by law enforcement officials as more fully described below, Plaintiff Dennis Kuzara ("Dennis") was wrongfully arrested, charged and incarcerated for a vicious and brutal murder which he did not commit. After

Defendants caused his arrest and prosecution by unlawful means in violation of Dennis' constitutional rights, Dennis spent two years in jail.

3. Dennis completely cooperated with the investigation throughout the years after the murder through the date of his arrest. Pursued relentlessly by Defendants, Dennis explained his innocence and never wavered. Still, Dennis was arrested and jailed. Thankfully, the charges were finally dropped in October 2020.

**Jurisdiction and Venue**

4. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

5. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

**The Parties**

6. Plaintiff, Dennis M. Kuzara, was at all relevant times herein a resident and citizen of the State of Illinois.

7. Defendant, Detective Steven Drews ("Defendant Drews"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

8. Defendant, Detective Abdiel Acevedo ("Defendant Acevedo"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

9. Defendant, Detective Christian Bognetti ("Defendant Bognetti"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

10. Defendant, Detective Jorge Gonzalez ("Defendant Gonzalez "), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

11. Defendant, Detective John Spencer ("Defendant Spencer"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

12. Defendant, Detective Michael Salvaggio ("Defendant Salvaggio"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

13. Defendant, Commander Robert Brandt ("Defendant Brandt"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

14. Defendant, Detective Joseph Gutierrez ("Defendant Gutierrez"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The

constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

15. Defendant, Detective Victor Lezote (“Defendant Lezote"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

16. Defendant, Chief Todd Shaver (“Defendant Shaver"), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

17. Defendant, Detective James Marsollais (“Defendant Marsollais "), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

18. Defendant, Detective John Steinhable (“Defendant Steinhable "), was at all relevant times herein employed as a police officer in the Village of Carpentersville Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Carpentersville Police Department employees, presently known and unknown.

19. Defendant Village of Carpentersville is an Illinois Municipal Corporation and was at all times the employer of Defendants named above. The Village of Carpentersville is responsible for the acts of Defendants while employed by the Village of Carpentersville and while acting within the scope of his employment, pursuant to its statutory obligation to indemnify them.

20. Defendants were each engaged in the conduct complained of under the color of state law and in the course and scope of their employment.

21. Each of the Defendants is sued in their individual capacity.

## Allegations of Fact

***Initial Investigation***

22. On October 2, 2011, Isabella Trejo ("Ms. Trejo") was found stabbed to death in her apartment at Oxford Road in the Village of Carpentersville.

23. Ms. Trejo had one knife protruding from her throat, a metal object stuck in her mouth, and a fan lying next to her head with a cord around her neck. There was also a second knife lying next to Ms. Trejo.

24. Around the time Ms. Trejo was found, Defendants learned that an individual named Darryl Huggins ("Huggins") stayed in an apartment adjacent to the murder scene, with his niece Yolanda Green. Ms. Green is Dennis' ex-wife.

25. Defendants also learned that Dennis and Ms. Trejo were close friends that had been intimate in the past. Defendants were made aware that Dennis visited Ms. Trejo at her apartment almost every day.

26. Defendants also learned very early on in their investigation that Dennis had no criminal history, while Huggins was a violent felon.

27. In addition to the above, Defendants learned at the outset of their investigation into Ms. Trejo's death that Dennis was mentally handicapped.

28. On October 2, 2011, Defendant Gonzalez, who assisted Defendant Drews in many interviews, was told that Ms. Trejo had been advised to call 911 on Huggins on at least one occasion.

29. Also on that date, Defendant Spencer interviewed Dennis. Dennis cooperated, answered all Defendant Spencer's questions, and provided the same information as he had, and would, throughout the investigation. He made no inculpatory statements and his innocence was apparent.

30. On the morning of October 3, 2011, only hours after Ms. Trejo's body was found, a witness advised Defendant Drews[1] that she had observed Huggins walking with another man and talking about the murder. The witness told Defendant Drews that she heard the man tell Huggins "whoever did this must be stupid because the cameras." Huggins responded, "I didn't think of that."

31. The witness also advised Defendant Drews that other witnesses had observed Huggins pacing back and forth outside the apartment, wearing a black hoodie, while the police were investigating the murder scene.

32. The witness also advised Defendant Drews that she had seen Ms. Trejo and Huggins together shortly before the murder, on September 28, 2011.

33. On October 4, 2011, Defendants learned that Huggins had a valid warrant out for his arrest for retail theft. Defendants took Huggins into custody based on that warrant.

34. Also on October 4, 2011, Defendants Drews and Spencer interviewed Huggins and learned he had been staying at his niece Yolanda Green's apartment in the very same apartment complex as Ms. Trejo's residence at the time of the murder.

35. Huggins claimed he had not been in Ms. Trejo's apartment for three years.

36. Huggins denied that had been with Ms. Trejo earlier in the week.

[1] Detective Drews was the lead detective from the date of the murder until July 1, 2013.

37. Defendants learned shortly after their interview of Huggins that Ms. Trejo had recently begun to receive money through the social security program. It was well known by residents of the apartment complex that Ms. Trejo had "come into money."

38. Defendants also learned early on in their investigation that Ms. Trejo had complained of someone stalking her.

39. Defendants learned that Ms. Trejo and Dennis were very close friends and they had absolutely no disagreements whatsoever. In fact, Defendants knew that Ms. Trejo and Dennis spent a pleasant evening together the evening before she was killed. On that evening, Dennis left around 10:00 pm and told Ms. Trejo to lock her door.

40. On January 26, 2012, Defendants Drews and Gonzalez interviewed a witness that advised them that Huggins had committed the murder. That witness explained that Huggins had killed Ms. Trejo because she owed money for crack cocaine and Huggins sought to steal her social security money.

41. On February 15, 2012, Defendants Drews and Salvaggio interviewed Dennis. Dennis cooperated and answered all Defendants' questions. His answers were consistent with the answers he had provided in the prior interviews. Despite his mental deficiencies, Dennis made no inculpatory statements and his innocence was apparent.

42. On April 17, 2012, Defendant Drews was told by a witness that Huggins had killed Trejo. That witness advised Drews that Huggins went to his niece Yolanda Green's apartment after killing Ms. Trejo to clean himself up.

43. On May 14, 2012, Dennis voluntarily provided his DNA to Defendants.

44. Dennis cooperated with Defendant Drews on that date as he always had when questioned.

45. On June 27, 2012, Defendant Drews learned that Huggins had been charged with harassing a former girlfriend.

46. On October 23, 2012, Defendants Drews and Salvaggio again interviewed Huggins. At this interview, Huggins changed his story. He said that he had not been in Ms. Trejo's apartment for at least one year before the murder, not three years as he had stated before.

47. On November 26, 2012, Defendants Drews and Gonzalez interviewed Dennis yet again. Although Dennis had been interviewed previously and never changed his story, Defendants chose to confront him. Dennis again advised them that he and Ms. Trejo had spent a nice evening together when he last saw her. They cooked dinner, watched movies, and discussed the Bible. Dennis left between midnight and 12:30 am, advising Ms. Trejo to lock the door.

48. Dennis also told Defendants that he returned to Ms. Trejo's apartment at 10:00 am and 12:30 pm the next day. Dennis explained that when Ms. Trejo's sister contacted him, he joined her and returned to enter the apartment.

49. On November 30, 2012, a witness told Defendant Gonzalez that Ms. Trejo had been seen with Huggins the night she was killed.

50. On March 13, 2013, Defendant Drews interviewed Dennis once again. Dennis cooperated, answered all questions and provided the same information as he had previously. Dennis made no inculpatory statements and his innocence was apparent.

51. On July 1, 2013 Defendant Acevedo became lead detective.

52. On December 3, 2013, Defendant Acevedo interviewed Dennis. Dennis cooperated, answered all questions and provided the same information as he had, and would do, throughout the investigation. He made no inculpatory statements and his innocence was apparent.

53. On October 18, 2018, Defendant Bognetti interviewed Vincent Kuzara ("Vincent"), Dennis' adult son. Vincent cooperated and provided no information whatsoever suggesting Dennis could have possibly committed the murder.

54. On October 19, 2018, Defendant Bognetti interviewed Dennis. Dennis cooperated, answered all questions and provided the same information as he had, and would do, throughout the investigation. He made no inculpatory statements and his innocence was apparent.

55. Defendants Lizotte, Shaver and Marsollais conducted several witness interviews throughout the investigation. Absolutely no evidence gathered during those interviews suggested Dennis could have possibly murdered Ms. Trejo. In fact, all the information Defendants gathered established that Dennis was completely innocent.

56. During their investigation into Ms. Trejo's murder, Defendants seized and analyzed Dennis' clothes and property seeking to obtain forensic evidence tying him to the crime. None was found.

***DNA Testing***

57. An initial round of DNA testing failed to produce any forensic results tying Dennis to the murder of Ms. Trejo.

58. In February 2018, the two aforementioned knives and small fan were sent to Bode Cellmark ("Bode") in Virginia for further DNA testing.

59. DNA samples taken from Dennis and Huggins were also sent to Bode.

60. In June 2018, Defendants learned that Bode had located Y-STR DNA potentially belonging to Dennis on the 10-inch butcher knife.

61. On October 18, 2018, Defendant Bognetti learned that Huggins had fled the state after his release from custody shortly after Ms. Trejo's murder.

***Arrest and Charges***

62. On November 2, 2018, Defendants Bognetti, Gutierrez and Brandt once again confronted Mr. Kuzara. On this date, Mr. Kuzara was 73 years old.

63. Defendants misrepresented their intentions, placed Dennis into their car and took him to the CPD.

64. Defendants placed Dennis into an interrogation room.

65. As they had many times before, Defendants interrogated Dennis.

66. As he always had, Dennis cooperated with Defendants, answered all of their questions, and denied any involvement in Ms. Trejo's murder.

67. Dennis did not deny that his DNA could have been inside Ms. Trejo's apartment and on items therein.

68. Dennis was a very close friend of Ms. Trejo and had been in her apartment on numerous recent occasions. He shared meals with her and at times their relationship was physically romantic.

69. Still, on that date, based on false evidence, false reports, and fabricated evidence, and contrary to everything Defendants learned in their investigation, Defendants arrested Mr. Kuzara for the murder of Ms. Trejo.

70. Absolutely no probable cause existed for Dennis' arrest.

71. In addition, Defendants knew that at the time Ms. Trejo was murdered, Dennis was physically incapable of committing the crime. He was elderly, frail and had been in a bus accident causing him to suffer fractured ribs.

72. On the morning of November 3, 2018, Dennis was forced to appear in court. His bond was set at $ 2,000,000.00.

73. The charges were procured through the presentation of false evidence.

*Exoneration*

74. Unable to raise the exorbitant bond, Dennis remained incarcerated in the county jail for years.

75. Then, in December, 2020, after learning the true facts surrounding the investigation from sources other than Defendants, the State's Attorney of Kane County dismissed the charges against Dennis and he was released from custody.

76. As a direct result of Defendants' conduct, Dennis sustained physical injuries and damages including loss of his freedom, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## COUNT I

### 42 U.S.C. § 1983
### (Withholding of Exculpatory Evidence)

77. Each paragraph of this Complaint is incorporated as if restated fully herein.

78. As described more fully above, Defendants while acting individually, jointly and/or in concert and in conspiracy, deliberately withheld exculpatory evidence. In doing so, Defendants violated their clearly established duty to report all material and exculpatory impeachment information to prosecutors.

79. Absent Defendants' misconduct, the prosecution of Dennis could not and would not have been pursued, and Dennis would not have been arrested, charged, and unlawfully detained.

80. Defendants' misconduct directly and proximately resulted in the unjust and wrongful arrest and unlawful detention of Dennis, thereby denying him his constitutional right to due process, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

81. As a direct and proximate result of this violation of his constitutional right to due process, Dennis suffered injuries, including but not limited to loss of liberty, physical sickness, mental anguish and emotional distress.

82. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Dennis' clearly established constitutional rights. Defendants' actions directly and proximately caused the injuries and damages to Dennis as claimed above and constitute due process violations under the 14th Amendment of the U.S. Constitution.

**COUNT II**

**42 U.S.C. § 1983**
**(Fabrication of Evidence)**

83. Each paragraph of this Complaint is incorporated as if restated fully herein.

84. As described more fully above, Defendants, while acting under color of law and within the scope of their employment, fabricated evidence they knew to be false.

85. As a result of knowingly fabricating evidence, Defendants knew or should have known Dennis was innocent.

86. Defendants continued their investigation of Dennis despite knowing or having should have known Dennis was innocent.

87. The evidence fabricated by Defendants was used to secure Dennis' unjust and wrongful pretrial detention, resulting in Dennis serving years of unjust and wrongful detention as well as causing him to face unwarranted charges and prosecution.

88. Defendants' fabrication of evidence directly resulted in the arrest, prosecution and detention of Dennis, thereby denying his constitutional due process rights.

89. Absent this misconduct, the prosecution of Dennis could not have and would not have been pursued.

90. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with a willful indifference to Dennis' clearly established constitutional rights.

91. Defendants' actions directly and proximately caused the injuries and damages to Dennis as claimed above and constitute due process violations under the 14th Amendment of the U.S. Constitution.

## <u>COUNT III</u>

**42 U.S.C. § 1983**
**(Failure to Intervene)**

92. Each paragraph of this Complaint is incorporated as if fully set forth herein.

93. In the manner described above, during the constitutional violations described above, Defendants stood by without intervening to prevent the misconduct, including but not limited to, the deliberate fabrication of evidence that caused Dennis' arrest, charges and unlawful detention.

94. As a result of Defendants' failure to intervene to prevent the violation of Dennis' constitutional rights, Dennis suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

95. The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Dennis' constitutional rights.

96. Defendants' actions directly and proximately caused the injuries and damages to Dennis as claimed above and constitute due process violations under the 14th Amendment of the U.S. Constitution.

**COUNT IV**

**42 U.S.C. § 1983**
**(Conspiracy to Deprive of Constitutional Rights)**

97. Each paragraph of this Complaint is incorporated as if fully set forth herein.

98. In the manner described above, Defendants together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to withhold evidence and deliberately fabricate false evidence against Dennis when they knew or should have known he was innocent, resulting in violations of Dennis' due process rights.

99. Defendants, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

100. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Dennis without probable cause, withholding evidence, and fabricating evidence.

101. The misconduct described in this count was undertaken with malice, willfulness, and reckless indifference to Dennis' rights.

102. Said conspiracy and overt acts were continued from on or about October 2, 2011 through to the present.

103. The conspiracy proximately caused the injuries to Dennis as set forth above.

## COUNT V

### Illinois State Law
### (Malicious Prosecution)

104. Each paragraph of this Complaint is incorporated as if fully set forth herein.

105. Defendants individually and/or jointly and in conspiracy, initiated and/or continued a malicious prosecution against Dennis without probable cause. Defendants were each instrumental in the initiation and perpetuation of the prosecution of Dennis. These Defendants each acted with malice.

106. This prosecution was terminated in October 2020, after Dennis had been unlawfully detained for approximately 2 years.

107. Defendants are liable for this malicious prosecution because it was proximately caused by their unlawful actions as set forth above.

108. These actions directly and proximately caused the injuries and damages to Dennis as claimed above and constitute the tort of malicious prosecution under Illinois law.

## COUNT VI

### Illinois State Law
### (False Imprisonment)

109. Each paragraph of this Complaint is incorporated as if fully set forth herein.

110. Defendants individually and/or jointly and in conspiracy, falsely imprisoned Dennis without probable cause.

111. Defendants were each instrumental in the false imprisonment of Dennis. These Defendants each acted with malice.

112. Defendants are liable for false imprisonment because it was proximately caused by their unlawful actions as set forth above.

113. These Defendants' false imprisonment of Mr. Kuzara continued from the date that Defendants caused Dennis to be investigated, arrested, charged and incarcerated, until he was released in October 2020.

114. As a result of the wrongful acts of Defendants in falsely imprisoning Dennis, Dennis suffered injuries and damages as set forth above.

## COUNT VII

**Illinois State Law**
**(Intentional Infliction of Emotional Distress)**

115. Each paragraph of this Complaint is incorporated as if fully set forth herein.

116. Defendants and their co-conspirators engaged in extreme and outrageous behavior against Dennis.

117. Defendants are liable for this intentional infliction of emotional distress because it was proximately caused by their actions as set forth above.

118. These Defendants' outrageous behavior caused Dennis to suffer severe emotional distress, including anxiety, fear, anger, depression, and humiliation, and the additional injuries set forth above.

## COUNT VIII

**Illinois State Law**
**(Conspiracy)**

119. Each paragraph of this Complaint is incorporated as if fully set forth herein.

120. Defendants and other persons, some of whom are not yet identified, including but not limited to law enforcement personnel, together reached an understanding, engaged in a course

of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison, maliciously prosecute, and to intentionally inflict severe emotional distress upon Dennis.

121. In furtherance of the conspiracy or conspiracies, Defendants named above, together with the unnamed co-conspirators, committed the overt acts set forth above.

122. The conspiracy or conspiracies alleged herein continued from at least October 2, 2011 through the present. Efforts to continue the conspiracy are ongoing.

123. Defendants are liable for this conspiracy because it was proximately caused by their unlawful acts and omissions as set forth above.

124. This conspiracy proximately caused the injuries to Dennis as set forth above.

## COUNT IX

### Illinois State Law
### 745 ILCS 10/9-102

125. Each paragraph of this Complaint is incorporated as if fully set forth herein.

126. Defendant, Village of Carpentersville, was at all times relevant to this action the employer of Defendants.

127. Defendant committed the acts alleged in this complaint in the course of and within the scope of his employment.

128. Pursuant to 745 ILCS 10/9-102, Defendant Village of Carpentersville is empowered and directed to pay any judgment for compensatory damages, and any associated attorneys' fees and costs, for which its employees, acting within the course and scope of their employment, are found liable.

## COUNT X

**Illinois State Law**
**(Respondeat Superior)**

129. Each paragraph of this Complaint is incorporated as if fully set forth herein.

130. At all times relevant to this Complaint, Defendants acted as agents of, and in the scope of their employment with, Defendant Village of Carpentersville.

131. Defendant Village of Carpentersville is liable for the torts of the police officer Defendants for their violations of state law under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, Dennis M. Kurzara, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, punitive damages, and costs against Defendants, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

By: /s/ Kathleen T. Zellner
Kathleen T. Zellner
Plaintiff's Attorney

Law Offices of Kathleen T. Zellner, P.C.
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
(630) 955-1212
Atty No: 618457